**Opinion issued August 27, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00945-CR

————————————

## WILLIAM LESTER RICHARD, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 338th District Court
Harris County, Texas
Trial Court Case No. 1259460

## MEMORANDUM OPINION

After a bench trial, William Lester Richard was convicted of murder. *See*
TEX. PENAL CODE ANN. § 19.02 (West Supp. 2009). Richard pleaded "true" to
allegations of two prior convictions, and the court sentenced him to 25 years in

prison. In his first issue on appeal, Richard argues that the trial court erred by allowing an amendment to the indictment to correct the first name of the complainant. Second, he argues that the trial court erred by admitting a signed statement that he gave to the police without receiving statutory or *Miranda* warnings. Third, he challenges the legal sufficiency of the evidence supporting the trial court's finding that he did not act in self-defense. Finding no reversible error, we affirm.

## Background

Complainant Carl Ryan had a history of mental illness that included nervous breakdowns, drug addiction, and paranoia. In the past, Ryan had stabbed a roommate with a knife during a paranoid episode, for which he was charged with aggravated assault and found not guilty by reason of insanity. Afterwards, Ryan was hospitalized for a period and diagnosed with bipolar disorder and schizophrenia. After his release, he lived with his parents and collected disability payments. Ryan would periodically use his disability payments to hire a prostitute.

After seeing an advertisement in the back of magazine, Ryan called Natalie Davis, who was Richard's girlfriend. After Ryan agreed to pay Davis $500 for her services, Davis and Richard drove to a motel where Ryan was staying. Davis met Ryan in the parking lot while Richard waited in the car. The pair walked up to Ryan's room on the second floor, and Davis told him that she required the payment

2

up front. They stepped into the room and Davis put her purse down. Immediately, Ryan began stabbing her with a knife. Davis raised her arms to fend off the attack, and she ran to the door. Ryan ripped off her wig, dragged her to the ground, and punched her repeatedly while saying he would kill her. Davis screamed for help, kicked Ryan, and escaped. She ran downstairs to the parking lot. Ryan did not chase her outside of the hotel room.

When she got to the car covered in blood, Davis told Richard that she had been stabbed. Richard attempted to stanch Davis's bleeding wounds with a t-shirt. He testified that he decided that they needed Davis's mobile phone, which had been left inside the motel room, to contact the police and the hospital. Richard also wanted the phone because it represented "money," meaning they needed it to conduct their business. By this time, Ryan had called 9-1-1. He told the operator, "A woman has been stabbed." When the operator asked whether she was still there, Ryan said, "No, she got away."

Richard went to the room, carrying a .45-caliber handgun in his pocket. He testified that he knocked on the door and shouted that he wanted the phone. Then he kicked in the door. Ryan was standing near the bathroom door. After Richard stated that he just wanted the phone, Ryan brandished a hatchet. Richard stated that he fired a warning shot, but Ryan charged him with the ax. Richard then shot Ryan six times from outside the room. Richard returned to the car and drove away

3

with Davis, leaving the phone behind in the motel room. They never went to a hospital or called the police; instead, Richard bandaged Davis with supplies from a pharmacy. The next day Richard asked a friend to get rid of his gun, and the friend later told him that he had thrown the gun in the ship channel.

Tracking down a number from the phone left in the motel room, the police found Richard outside a friend's home a few days later. According to an officer's testimony, Richard stated that he knew why the police had come—his girlfriend had shot someone at a motel after being stabbed. He said that he wanted to cooperate. Richard then drove his car to his house with the police following in a separate car. He let them inside the house, where the police met Davis and saw her wounds. The police asked if Richard and Davis would be willing to give them a statement at the police station, and they agreed. Richard and Davis turned over to police Davis's bloody clothes, Richard's bulletproof vest, and a half-empty box of ammunition for Richard's handgun. Richard drove his own car to the station, while the police drove Davis, so that the two could not talk to each other before giving statements.

The police officer who received Richard's statement testified that after arriving at the station, Richard was offered something to drink and the use of the restroom. Richard was told that he was not in custody. He began giving a

statement to the police around 5:00 p.m. in an open computer area in the station. The officer typed Richard's statements, which Richard reviewed and signed.

According to Richard's initial statement, Davis shot Ryan with Richard's gun. He finished giving this statement at approximately 9:00 p.m. Knowing that this story was inconsistent with the physical evidence from the scene, the interviewing police officer told Richard that his statement was inconsistent and asked Richard to take a polygraph test. Richard agreed. The polygraph test took an additional two hours, lasting from around 9:40 p.m. until 11:30 p.m. The officer informed Richard that the polygraph test also indicated that his statement had been "inconsistent." Richard then gave another statement from around 11:35 p.m. to 1 a.m., in which he stated that he had shot Ryan.

Richard was at the station for over eight hours. According to his testimony, he asked to leave the interview to smoke a cigarette, but he was told to wait. Richard was never given a warning of his rights pursuant to *Miranda v. Arizona* or article 38.22 of the Texas Code of Criminal Procedure. After he signed his second statement, Richard left the police station and returned home.

Several years later, Richard was indicted for the murder of Carl Ryan. The indictment listed the name of the complainant as "Carl Ryan" in the first paragraph. But in the second paragraph, the complainant was identified as "Carol Ryan." On the first day of trial, the prosecutor orally moved to amend the

5

indictment, and Richard's attorney objected. The trial court allowed the indictment to be presented after striking the "o," reasoning that the amendment would not materially alter the indictment. The trial court first observed that the complainant was alleged to be "Carl Ryan" in a previous indictment's second paragraph, reinforcing the conclusion that the "o" was a typographical error. Second, the trial court noted there was no indication that there was any complainant named "Carol Ryan"—the autopsy and medical records all referred to "Carl Ryan." Third, the trial court considered that the indictment did not allege several counts—there was only one charge for murder with two manner-and-means paragraphs stating how the murder was alleged to have occurred, so any reference to a complainant would refer to the same complainant.

After a bench trial, the trial court convicted Richard of murder. Richard then filed this timely appeal.

## Analysis

### I. Sufficiency of the evidence

Richard challenges the legal sufficiency of the evidence disproving his defense of necessity. When reviewing sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine, based on that evidence and any reasonable inferences from it, whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Gear v.*

*State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781 (1979)). We do not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, the factfinder has the responsibility to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences. *Id.* "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2012). Deadly force is justified to protect the actor against another's use or attempted use of unlawful deadly force and to prevent another's imminent commission of murder, kidnapping, sexual assault, or robbery. TEX. PENAL CODE ANN. § 9.32(a).

The defendant bears the initial burden to produce evidence supporting a justification defense, then the burden shifts to the State to disprove the defense beyond a reasonable doubt. *Zuliani v. State*, 97 S.W.3d 589, 594–95 (Tex. Crim. App. 2003). When a factfinder finds the defendant guilty, there is an implicit

7

finding against self-defense. *Id.* at 594. When reviewing legal sufficiency of the evidence supporting a finding against self-defense, the evidence is viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and also against appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

There was evidence that Richard did not reasonably believe that force was immediately necessary to protect himself. Davis testified that Ryan had stopped following her and remained inside his motel room. It was Richard, not Ryan, who initiated the fatal encounter when he kicked down the motel room door. Richard contends that he had a reasonable belief that returning to Ryan's room and kicking down the door was necessary for him to retrieve the mobile phone, ostensibly, at least in part, to call police and to seek medical help. Other evidence presented at the trial, however, undermines the argument that this was his motivation. After the shooting, Richard left the phone behind in the room. Richard never took Davis to the hospital or to police, and he never called for help—his stated reason for needing the phone. Additionally, Richard initially lied to the police about who shot Ryan. And he attempted to dispose of his gun by giving it away to a person who promised to drop the weapon in the ship channel.

8

Self-defense is an issue of fact for the factfinder to determine. *See Williams v. State*, 226 S.W.3d 611, 616 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Saxton*, 804 S.W.2d at 913). Although there was some evidence that Richard believed it was necessary to return to the motel room to retrieve the phone, the State presented evidence that Richard did not have a reasonable belief that he needed to return to the room. Richard testified that he was mad about what happened to Davis, and the factfinder could have concluded that he was motivated by revenge. The trial court, as factfinder, was fully entitled to disbelieve the necessity of Richard's actions. *See, e.g.*, *Madrigal v. State*, 347 S.W.3d 809, 818 (Tex. App.—Corpus Christi 2011, pet. ref'd) (stating that although there was evidence that would have allowed the factfinder to find that the defendant acted in self-defense, the factfinder was free to disbelieve such evidence and rely on additional evidence that he did not act in self-defense).

We conclude that, viewing the evidence in the light most favorable to the verdict, a rational factfinder could have found beyond a reasonable doubt against Richard on the issue of self-defense. *See Saxton*, 804 S.W.2d at 914; *Williams*, 226 S.W.3d at 616. We overrule Richard's challenge to the sufficiency of the evidence in this respect.

## II.    Amendment of indictment

Richard complains that the trial court allowed an alteration in the indictment without giving him a trial continuance pursuant to the Texas Code of Criminal Procedure.  Article 28.10 requires that the court, on the defendant's objection and request, allow the defendant a continuance of at least 10 days to respond to any amendment to the form or substance of the indictment.  *See* TEX. CODE CRIM. PROC. ANN. art. 28.10(a) (West 2006).  The morning of the first day of trial, the trial court struck an apparently extraneous "o" from one of several references to the complainant's name, and then it allowed the introduction of the indictment.

Assuming that the amendment on the day of trial over Richards's objection violated article 28.10, we nevertheless can only reverse his conviction on this basis if the error affected his substantial rights.  *See* TEX. R. APP. P. 44.2(b).  Richard contends that violations of article 28.10's amendment language are not subject to harmless-error review, relying on *Sodipo v. State*, 815 S.W.2d 551 (Tex. Crim. App. 1991).  In *Sodipo*, the Court of Criminal Appeals held that article 28.10 is not subject to harmless-error review, but that holding was impliedly overruled in *Wright v. State*, 28 S.W.3d 526, 531–32 (Tex. Crim. App. 2000).  This court has recognized that *Sodipo* was overruled in that regard and that violations of article 28.10 are subject to harmless-error review.  *E.g., James v. State*, No. 01-10-00693-CR, 2012 WL 1355731, at * 7 (Tex. App.—Houston [1st Dist.] Apr. 19, 2012, pet.

10

ref'd) (designated for publication). Hence, we disregard a statutory article 28.10 violation unless the trial court's error affects a defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005) (stating that statutory violation claims are treated as non-substantive errors for purposes of conducting harm analysis).

Because the amendment at issue was merely a typographical correction to the name of the complainant, it did not harm Richard or affect his substantial rights. *See Trejos v. State*, 243 S.W.3d 30, 42 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (concluding that when the victim was identified in the indictment's first paragraph, an amendment to include the name of same victim in the second paragraph of the indictment did not prejudice defendant's substantial rights); *see also Valenti v. State*, 49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.) (disregarding correction to date of offense in indictment, to which defendant's attorney objected on the day of trial, because defendant was neither surprised nor misled to his prejudice in preparing his defense). There was no reasonable implication that there was ever a complainant named "Carol." All of the autopsy and medical records refer to the same complainant. As the trial court noted, the indictment included only one charge for murder with two manner-and-means paragraphs, meaning that any reference to a complainant would refer to the same complainant. The previous version of the indictment listed "Carl Ryan"

11

rather than "Carol" in the second paragraph. Accordingly, even if the trial court erred in allowing the amendment to the indictment, we disregard it as harmless error. *See* TEX. R. APP. P. 44.2(b); *Trejos*, 243 S.W.3d at 42.

We overrule Richard's challenge based on the amendment of the indictment.

## III. Admission of Richard's statements

Richard also argues that the trial court erred by denying his motion to suppress his second statement to the police. He contends that his interview became custodial before he completed his second statement, when he made the "pivotal admission" that he shot Ryan. He therefore contends he should have been given *Miranda* warnings and the statutory warnings contained in article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005); *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602 (1966).

"A trial court's ruling on a motion to suppress, like any ruling on the admission of evidence, is subject to review on appeal for abuse of discretion." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We use a bifurcated standard of review in assessing the trial court's ruling. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We grant the trial court almost complete

12

deference in determining historical facts, and the trial court is the sole trier of fact and judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

A trial court's ultimate custody determination is a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *Ervin v. State*, 333 S.W.3d 187, 203 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We defer almost totally to a trial court's custody determination when the questions of historical fact turn on credibility and demeanor. *Herrera*, 241 S.W.3d at 526–27. Conversely, we review a trial court's custody determination de novo when the questions of fact do not turn on credibility and demeanor. *Id.* at 527. When a trial judge denies a motion to suppress and does not enter findings of fact, the evidence is viewed in the light most favorable to the trial court's ruling and we assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Id.* (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

In *Miranda*, the United States Supreme Court determined that an accused person who is held in custody must be warned "at the outset" of interrogation. *Miranda*, 384 U.S. at 467–68, 86 S. Ct. at 1624; *Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). Failure to comply with the *Miranda* warning requirements results in forfeiture of the use of any statement obtained during that

13

interrogation by the prosecution during its case-in-chief. *Jones*, 119 S.W.3d at 772. Likewise, the Code of Criminal Procedure provides that a statement is only admissible if, among other requirements, the defendant was given the warnings in section 2(a) of article 38.22 before the statement was made and the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Herrera*, 241 S.W.3d at 526; *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a) (West 2005).

The record undisputedly shows that Richard never received *Miranda* or article 38.22 warnings. But neither *Miranda* warnings nor article 38.22 warnings are required unless the interrogation of the accused was custodial. *Herrera*, 241 S.W.3d at 526; TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a). The construction of "custody" is the same for both *Miranda* and article 38.22 purposes. *Herrera*, 241 S.W.3d at 526.

The defendant bears the initial burden of proving that a statement was the product of a custodial interrogation. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009). A person is in "custody" only if, under the facts and circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322–25, 114 S. Ct. 1526, 1528–30 (1994)). The question turns on whether a

14

reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. *Nguyen v. State*, 292 S.W.3d 671, 678 (Tex. Crim. App. 2009). The reasonable person standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 2388 (1991)).

The determination of custody is entirely objective, and the subjective intent of law-enforcement officials is not relevant unless communicated to the suspect. *Id.* The subjective belief of the suspect is also not relevant. *Id.* When a person voluntarily accompanies police officers to an interview, and he knows or should know that the police officers suspect he may be implicated in the crime, he is not thereby "restrained of his freedom of movement" and is not in custody. *Shiflet v. State*, 732 S.W.2d 622, 630 (Tex. Crim. App. 1985). Stationhouse questioning does not in and of itself constitute custodial interrogation. *Dowthitt*, 931 S.W.2d at 255. Nor does simply being the focus of a criminal investigation. *Martinez v. State*, 131 S.W.3d 22, 32 (Tex. App.—San Antonio 2003, no pet.). Further, submitting to and failing a polygraph test does not automatically establish custody. *Shiflet*, 732 S.W.2d at 631.

Generally, four situations may constitute custody: (1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect he is not free to leave; (3) law enforcement

15

officers create a situation that would lead to a reasonable person to believe that his freedom of movement has been significantly restricted, or (4) there is probable cause to arrest the suspect, and law enforcement officers do not tell the suspect he may leave. *Gardner*, 306 S.W.3d at 294; *Dowthitt*, 931 S.W.2d at 254. The fourth category applies only when the knowledge of probable cause is communicated— even then custody is established only if the communication of probable cause is combined with other circumstances that would lead "a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Gardner*, 306 S.W.3d at 294 n.48.

Additional factors for determining custody include whether the suspect arrived at the interrogation place voluntarily, the length of the interrogation, any requests by the suspect to see relatives or friends, and the degree of control exercised over the suspect. *Ervin*, 333 S.W.3d at 205; *Xu v. State*, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref'd). An interrogation that begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may escalate the interview to a custodial interrogation. *Dowthitt*, 931 S.W.2d at 255. After examining those factors, we also address whether there was probable cause to arrest the defendant and whether any of the four situations constituting custody was established. *Ervin*, 333 S.W.3d at 205 (citing *Gardner*, 306 S.W.3d at 294).

16

Given the circumstances of his voluntary decision to go to the police station and cooperate with the investigation, Richard concedes that his initial statement was noncustodial. But he argues that the interview turned into a custodial interrogation once he admitted that he had shot Ryan. After this "pivotal admission," Richard argues that he should have received warnings of his rights pursuant to *Miranda* and article 38.22. He asserts that after the admission, the police had probable cause to arrest him, and therefore his situation falls into the category of custodial interrogations in which there is probable cause to arrest and the police do not tell the suspect he is free to leave. *See Dowthitt*, 931 S.W.2d at 255; *Shiflet*, 732 S.W.2d at 629.

Even in the probable cause situation, however, custody is not automatically established when an admission gives investigators probable cause to arrest a suspect and they do not inform him of his right to leave. Instead, probable cause is merely a factor to be considered, along with other circumstances, to determine whether a reasonable person would be led to believe that he is under restraint to the degree associated with arrest. *Dowthitt*, 931 S.W.2d at 255; *Ervin*, 333 S.W.3d at 211; *Garcia v. State*, 106 S.W.3d 854, 858 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Richard voluntarily went to the police station. He was interviewed in an open room, offered drinks and restroom breaks, and told that he was free to leave.

17

Richard was not placed under any additional restraints or conditions after his admission. Although he remained at the station for a long duration, over eight hours, the other evidence shows that the nature of the interrogation was noncustodial and that Richard remained at the station voluntarily. Richard testified that he requested to stay longer voluntarily after his second statement to submit to a second polygraph. Richard's admission that he shot Ryan provided probable cause to arrest him, but the record shows that the police officers made no manifestation of belief that there was probable cause. *See Ervin*, 333 S.W.3d at 211 (not reasonable for defendant to believe she was under restraint when officer did not manifest belief there was probable cause and the record did not show the defendant knew her admission gave rise to probable cause). After his incriminating admission, he left without being arrested after he finished signing his second statement. *See Meek v. State*, 790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (distinguishing custodial from noncustodial interrogation based on fact that suspect was allowed to leave unhindered after giving statements); *Marcus v. State*, Nos. 01-06-00483-CR & 01-06-00484-CR, 2007 WL 3293621, at *9 (Tex. App.— Houston [1st Dist.] 2007, pet. ref'd) (memo. op., not designated for publication) (noting that courts generally consider being allowed to leave indicative of a noncustodial interview, even when defendant makes an admission establishing probable cause).

18

Under these circumstances, a reasonable person would not believe that he was under restraint to the degree associated with an arrest. *Compare Oregon v. Mathiason*, 429 U.S. 492, 493–95, 97 S. Ct. 711, 713–14 (1977) (interview noncustodial when suspect came to police voluntarily, was told not under arrest, gave incriminating confession before receiving *Miranda* warning, and was allowed to leave freely after being told the case would be referred to the district attorney), *and Ervin*, 333 S.W.3d at 211 (noncustodial interview when suspect voluntarily went to station, was told she could leave, remained unhandcuffed, was at station for four hours, and went home after making incriminating statements), *and Garcia*, 106 S.W.3d at 858–59 (suspect voluntarily went to police station and gave statement, was left unguarded in visitor's room, and nothing prevented him from leaving station), *with Dowthitt*, 931 S.W.2d at 254–56 (reasonable person would have realized under restraint after incriminating admission because police officers told him he was not allowed to leave, accompanied him throughout the encounter, including to the restroom, and ignored his repeated requests to see his wife and that he wanted to stop the interrogation), *and Ruth v. State*, 645 S.W.2d 432, 434 (Tex. Crim. App. 1979) (interrogating officer testified that he "would have detained" the suspect had he tried to leave and in fact immediately arrested him). Thus, the record supports the trial court's determination that Richard's statements were

19

admissible as noncustodial. We overrule the challenge to the admission of Richard's statement.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).